IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| HILDA L. SOLIS, Secretary of Labor, United States Department of Labor,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>HILL COUNTRY FARMS, INC., d/b/a HENRY'S TURKEY SERVICES , and KENNETH HENRY, Individually,<br><br>　　　　　　　Defendants. | Civil No: 3:09-cv-00162-HDV-RAW<br><br><br><br>RULING GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

Plaintiff Hilda Solis, Secretary of Labor, United States Department of Labor, sues

defendants Hill Country Farms, Inc. d/b/a Henry's Turkey Services, and Kenneth Henry in his

individual capacity, alleging that defendants violated the Fair Labor Standards Act of 1938

(FLSA), 29 U.S.C. §§ 206, 207, 211(c), 215(a)(2), 215(a)(5), and 216(c).  At all times relevant

hereto, Hill Country Farms was an enterprise engaged in commerce within the meaning of 29

U.S.C. § 203(s)(1).  Jurisdiction of this matter is conferred upon this court by 29 U.S.C.

§§ 216(c) and 217 and 28 U.S.C. § 1345.  Plaintiff moves for partial summary judgment[1] in

respect to defendants' alleged minimum wage, § 206, and overtime, § 207, violations.

Defendants resist, and the motion is submitted.

**MOTION STANDARDS**

Summary judgment is properly granted only when the record, viewed in the light most

favorable to the nonmoving party, shows that there is no genuine issue of material fact, and the

---

[1] The Secretary also seeks back wages for six workers without disabilities listed in section 3 of appendix A to the complaint and seeks an injunction pursuant to 29 U.S.C. § 217 against future violations of the FLSA, issues that are not addressed in the motion.

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Walsh v. United States, 31 F.3d 696, 698 (8th Cir. 1994).  The moving party must establish its right to judgment with such clarity there is no room for controversy.  Jewson v. Mayo Clinic, 691 F.2d 405, 408 (8th Cir. 1982).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party.  Id. at 248.  "As to materiality, the substantive law will identify which facts are material . . . . Factual disputes that are irrelevant or unnecessary will not be counted."  Id.

At the summary judgment stage, the district court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter.  Id. at 249.  Instead, the court's function is to determine whether a reasonable jury could return a verdict for the nonmoving party based on the evidence.  Id. at 248.  The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor.  Quick v. Donaldson Co., 90 F.3d 1372, 1377 (8th Cir. 1996).  "Because discrimination cases often turn on inferences rather than on direct evidence," the court is to be particularly deferential to the nonmovant.  EEOC v. Woodbridge Corp., 263 F.3d 812, 814 (8th Cir. 2001) (citing Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994)). "Notwithstanding these considerations, summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case."  Id.  See Griffith v. City of Des Moines, 387 F.3d 733, 735-36 (8th Cir. 2004).

## FACTUAL BACKGROUND

The following facts are not disputed or are defendants' version of disputed facts.  Fed. R. Civ. P. 56(a).

Defendant Hill Country Farms, Inc., d/b/a Henry's Turkey Services is a for-profit corporation located in Goldthwaite, Texas, and engaged in a variety of agricultural activities.  In the mid-1960's, Hill Country Farms, Inc., owned and operated by T.H. Johnson, began working with men with disabilities living in Texas.  At that time, defendant Kenneth Henry owned Henry's Turkey Services, Inc.  In 1972, Henry and T.H. Johnson merged their companies to form Hill Country Farms, Inc. d/b/a Henry's Turkey Services.  Henry has been a 50% owner and vice president or president of the merged company from the date of incorporation until the present.  At all times and in all matters relevant hereto, the company used the names Hill Country Farms, Henry's Turkey Service, and Hill Country Farms doing business as Henry's Turkey Service, Inc., interchangeably.  Hereinafter, references to Hill Country Farms or Henry's Turkey Service are to defendant Hill Country Farms d/b/a Henry's Turkey Service.

After the two corporations merged, Henry brought the Hill Country Farms' men with disabilities to the Midwest to work in Henry's Turkey Service's turkey insemination business and later to load turkeys on trucks.  Henry's Turkey Service was caretaker for the men with disabilities and referred to them as, "the boys."  Beginning in the late 1970's, Henry and T.H. Johnson negotiated with Louis Rich Foods to supply workers at its turkey processing plant in West Liberty, Iowa.  Henry's Turkey Service began providing the men with disabilities to Louis Rich to work on the plant's turkey processing line.

During the entire period they worked at the turkey processing plant, the Henry's Turkey Service turkey plant workers were housed in a converted school house in Atalissa, Iowa, known

as the bunkhouse.  During all times relevant hereto, Hill Country Farms rented the bunkhouse from the city of Atalissa for $600.00 per month.  Most of the men living at the bunkhouse worked at the plant, and included Douglas Barco, Leonard Bearfield, Clayton Gene Berg, James Keith Brown, David Crouch, James Fowler, John David Hatfield,  Paul Hayek, Tommy House, Kenneth Jackson, Tommy Johnson, Carl Wayne Jones, Johnny Kent, Ronald Lashley, Willie Levi, Jeffery S. Long, Johnny McDaniels, Joe Morrell, William (Bill) Murray, Robert O'Bier, John D. Owens, Preston Pate, Billy Penner, Robert Penner, Frank Rodriquez, Doyle Trantham, Raymond Vaughn, Brady Watson, and Henry (Dewey) Wilkens.  Three of the workers with disabilities—Pete Graffagnino, Leon Hall, and Johnny McDaniels—generally worked at the bunkhouse rather than the plant, and performed house keeping chores, including helping to prepare the meals.  Henry's Turkey Service determined which individuals worked at the plant and which worked at the bunkhouse.

Over the years, the plant changed ownership several times, but Henry's Turkey Service continued to provide workers throughout each change of ownership.  In 1996, West Liberty Foods bought the plant, and it entered into a contract with Henry's Turkey Service, continuing the arrangements that the latter company had with the prior plant owners.  Pursuant to the contract, Henry's Turkey Service was designated "the contractor," and was required to provide an adequate number of "contractor's employees" and "at least two crew chiefs" to perform services required by the contract.  Under the contract, West Liberty Foods informed Henry's Turkey Service what positions it needed filled on its processing line, and Henry's Turkey Service determined which of its workers would fill what position.  Henry's Turkey Service crew chiefs supervised those workers.

4

Henry and T.H. Johnson negotiated with the owners of West Liberty Foods to determine the rate of pay for the turkey plant workers.  West Liberty Foods paid Hill Country Farms for the plant workers' labor on a weekly basis, multiplying the number of birds processed by the number of positions filled by Henry's Turkey Service workers and again by the bird rate to determine the total amount of compensation.  Hill Country Farms deposited the checks into a bank account in Goldthwaite, Texas entitled "Henry's Turkey Service-Iowa."

Henry and T.H. Johnson talked on the phone regarding the Iowa operations from one to ten times per week.  When T.H. Johnson became ill in 2005, Henry became actively involved in the business in Iowa, including handling the financial responsibilities of the operation.  As early as 2005, Henry was scheduling the work of the crew chiefs at the bunkhouse.  Hiring of workers in Iowa was also subject to Henry's approval.

Between 2006 and until the Atalissa bunkhouse was shut down on February 7, 2009, Henry increased his involvement in running the facility further, more closely controlling crew chiefs Randy and Dru Neubauer.  As an example, Henry directed Randy Neubauer to cut the hours that supervisors were working at the bunkhouse, stating that, "I don't need three people up here helping Pete Graffagnino to cook lunch."  Henry stated that "[a]s a boss, you look at these kinds of things and say, 'Hey, how do we justify that?' "  Henry made several trips to Iowa in 2007 and again in 2008 to oversee the operations.

Jane Ann Johnson was Hill Country Farms' co-owner and corporate treasurer during the dates relevant to this case, November 16, 2006 to February 7, 2009.  She was the corporate actor most familiar with, and who performed the company's duties relating to, the social security benefits of the men with disabilities, who all received Social Security ("SS") or Supplemental Security Income ("SSI") benefits, or both.

5

As their caretaker, Hill Country Farms was the designated representative payee of the SS and SSI benefits for each of the men with disabilities. The monthly benefits were directly deposited into the workers' individual bank accounts, located at the Mills County State Bank in Goldthwaite, Texas. Money for the workers' food and housing came from these benefits. Every month, Jane Ann Johnson wrote and signed checks from each worker's account payable to Hill Country Farms to reimburse it for the workers' room and board. In 2007, the monthly amount drawn on each worker's account was $426.28. In 2008, the amount was $487.00. Jane Ann Johnson kept a ledger of the checks. Additionally, checks from each worker's account were issued on a regular basis to Hill Country Farms to reimburse it for "ledger" expenses, such as doctor's bills, clothes, and entertainment expenses, and also to "cash" with notations of "spending money" and "entertainment."

During the period from November 16, 2006 to February 7, 2009, Henry's Turkey Service decided the rates of pay for the turkey plant and bunkhouse workers and also decided the manner in which they were paid. Hill Country Farms listed the turkey plant and bunkhouse workers as employees on documents submitted to the Texas Workforce Commission's Unemployment Tax Services, withheld Social Security and Medicare taxes from their income, and completed W-2 Wage and Tax Statements for each worker. The company also prepared time sheets and issued paychecks to the turkey plant and bunkhouse workers. Hill Country Farms received over $500,000.00 annually in 2006, 2007 and 2008 from West Liberty Foods for work performed by the workers with disabilities.

From at least 2006 until February 7, 2009, the turkey plant workers with disabilities worked on the processing line, commingled with West Liberty Foods' non-disabled employees.

Specifically, the men worked in the evisceration department.  Their work hours were dictated by the times the processing line started and ended each day.  It started at 5:00 a.m.

Every day, Henry's Turkey Service crew chiefs transported the turkey plant workers in vans from the bunkhouse to the plant.  The vans arrived at the plant no later than 4:45 a.m. each workday.  After arriving at the plant, the turkey plant workers went to the locker room and changed into required work clothes.  They were required to be downstairs standing on the processing line no later than 5:00 a.m., ready for the first bird to come by.  West Liberty Foods' line operating times and Henry's Turkey Service's time sheets record the turkey plant workers' daily hours as starting at 5:00 a.m.  The workers were given a one-half hour unpaid lunch.  When the line stopped, the workers went back up to the locker room, changed into their own clothes and were returned to the bunkhouse in the vans.

Henry's Turkey Service crew chiefs filled out time records for the turkey plant and bunkhouse workers and sent the records to the main office in Goldthwaite, Texas, where they were transcribed onto Hill Country Farms monthly time sheets.  Each time sheet was stamped with lines marked "Actual Income," "in kind Room & Board," "in kind Care" and "Total."  The amounts filled in for "Actual Income," "in kind Room & Board," and "in kind Care" were the same for each turkey plant worker and bunkhouse worker.  Hill Country Farms asserts that the "Total" amount reflects the wages paid to the workers each month, either in cash or in terms of the cost to Hill Country Farms of furnishing them with room, board, and care.

Robert Berry, Hill Country Farms' accountant and corporate secretary, calculated Hill Country Farms' claimed costs of "in kind Room and Board" and "in kind Care."  Berry did one annual computation for both categories and applied the resulting amounts to all of the workers with disabilities.  To reach the yearly figure, Berry examined Hill Country Farms' end-of-year

financial statements and added all costs that he concluded were related to room and board.  After

doing so, he would divide the total cost by twelve months, and then again by the number of

workers with disabilities.  For the entire following year, Berry's calculation of room and board

would be shown on workers' pay stubs as part of their total wages.  The same figure was used as

the room and board charge for each worker every month for the entire year.  Berry used the same

process to determine the amount of in kind care that the company would report as wages on the

workers' pay stubs.

The company's charges for in kind room and board and in kind care increased annually,

while the workers' cash wages never varied.  It was $65.00 a month, month after month, year

after year.  Hill Country Farms chose to pay this amount because it was the maximum cash wage

a worker could receive that would not reduce the amount of his Social Security benefits.  Even

when company time sheets reflected that the workers put in over 40 hours in a week, the stated

wage on the time sheet always remained the same.  The manner of calculating wages and the

manner in which the wages were paid was the same for both turkey plant and bunkhouse

workers.  The company reported only the $65.00 per month to government agencies as wages.

The Wage and Hour Division of the Department of Labor investigated Hill Country

Farms two times prior to the investigation that resulted in the current lawsuit.  The first

investigation was conducted in 1997.  The second was concluded in 2003, and covered the

period from 1999-2001.  Both investigations found that Hill Country Farms failed to pay the

workers with disabilities one and one-half times their regular rates of pay for hours they worked

in excess of forty per week, a violation of 29 U.S.C. § 207.  Following both investigations, the

company paid the back wages sought and agreed to comply with the provisions of the FLSA in

the future.  In 2003, the Wage and Hour Division provided Hill Country Farms with the

8

following documents: (1) 29 C.F.R. Part 516, "Records To Be Kept By Employers," including §

516.27, "Board, lodging, or other facilities" under section 3(m) of the Act; (2) 29 C.F.R. Part

778, "Overtime Compensation"; (3) 29 C.F.R. Part 785, "Hours Worked"; (4) 29 C.F.R. Part

531, "Wage Payments Under the Fair Labor Standards Act," including specific regulations

covering Section 3(m); and (5) Section 3(m) of the Act.  The Wage and Hour Division also

explained to the company the FLSA's requirements, including but not limited to, those

governing minimum wages, overtime compensation, Section 3(m) credits, and record keeping.

The company, however, never changed the formula it set up years before to determine wages.

 In 2008, Henry and Jane Ann Johnson jointly decided to stop providing workers to the

West Liberty Foods processing plant and to shut down the bunkhouse facility in Atalissa.  Henry

informed West Liberty Foods of the decision and determined the order in which the workers

would stop working at the plant.  Henry decided to bring back an ex-employee, Warren Davis, to

get the bunkhouse ready to return to the city instead of keeping crew chiefs Randy and Dru

Neubauer on to oversee the process.

 After conducting the investigation that led to the current case, the Department of Labor's

Wage and Hour Division Investigator (the investigator) calculated the amounts of overtime and

minimum wages that Hill Country Farms failed to pay the turkey plant and bunkhouse workers

from November 19, 2006[2] until February 7, 2009.  To calculate the hours for the turkey plant

workers, the investigator began with West Liberty Foods' weekly line operating times as the

---

[2] The Secretary's complaint and brief identify the starting date of defendants'
underpayment of wages as November 16, 2006.  She filed the complaint in this case on
November 17, 2009, so November 16 is a day beyond what would be the beginning of the
limitations period if the three-year statute of limitations applies.  The investigator's affidavit
shows, however, that he used November 19, 2006, as the beginning date for his calculations (his
report shows "week ending November 26, 2006," as the starting point.)  (Pl.'s App. at 172.)

base amount of hours worked each week.  The investigator then examined Henry's Turkey Service time sheets.  If they showed that a worker was absent, the investigator subtracted that day's hours from the line operating times to reflect the actual number of hours worked each week.  The investigator added fifteen minutes of time to each day to compensate for the time between 4:45 a.m., the time the workers were required to arrive, and 5:00 a.m., the time the line began to operate, because Henry's Turkey Service did not record it.

For each worker, in weeks that the hours worked were forty or less, the investigator multiplied the total weekly hours by the applicable federal minimum wages.  In weeks where the hours worked were in excess of forty, the investigator multiplied the first forty hours by the applicable Iowa minimum wage, and the hours in excess of forty by one and one-half the Iowa minimum wage.  The investigator credited Hill Country Farms with a $15.00 payment each week, to reflect the weekly pro rata share of the monthly $65.00.  The results were the total amounts of weekly wages due the workers.

The investigator followed the same procedure to calculate the wages of the bunkhouse workers, with two differences.  First, the investigator used available Henry's Turkey Service time sheets to determine the base amount of hours worked each week.  For weeks where there were no time sheets, the investigator computed the workweeks based on forty hours since the available time sheets consistently reflected forty-hour workweeks.  Second, only the hours reflected on Henry's Turkey Service's time sheets were used to determine the amount of hours worked.  The investigator's computations remained the same as those for the turkey plant workers in all other respects.  The investigator determined that Hill Country Farms owed the thirty-one workers a total of $518,727.88 in unpaid minimum wages and overtime compensation covering a two-year period of back wages.  The amount over three years is $880,777.17.

10

**DISCUSSION**

I.   **WHETHER WORKERS WITH DISABILITIES WERE EMPLOYEES OF DEFENDANTS HILL COUNTRY FARMS AND HENRY**

Defendants' sole defense to the Secretary's motion for summary judgment is that the men with disabilities were not their employees. The burden of proving that an employer-employee relationship existed is on the Secretary. Reich v. ConAgra, Inc., 987 F.2d 1357, 1360 (8th Cir. 1993) (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-87 (1946); Marshall v. Truman Arnold Distrib. Co., Inc., 640 F.2d 906, 911 (8th Cir. 1981)). Under the FLSA, the determination of whether a party is an employer is a question of law for the court. Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir. 1991). Whether either defendant, or both defendants, employed the workers with disabilities are different issues; both defendants will be addressed separately.

Under the FLSA, the term "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). "The language of the Act provides little guidance in delineating the contours of the employer-employee relationship." Reich, 987 F.2d at 1360. In determining employer status, "economic reality" prevails over technical common law concepts of agency. Goldberg v. Whitaker, 366 U.S. 28, 33 (1961). It is possible under the FLSA for more than one entity or individual to qualify as an employer in respect to specific employees. See Falk v. Brennan, 414 U.S. 190, 195 (1973) (maintenance workers were employees of both apartment building owners and defendant real estate management company).

Defendants get stuck arguing that West Liberty Foods was the employer of the men with disabilities, presumably to show that it was the lone employer. There is no question that

somebody employed the men with disabilities—they were not themselves independent

contractors.  See Rutherford Food Corp. v. McComb, 331 U.S. 722, 729 (1947).  Whether West

Liberty Foods would qualify as an employer is beside the point, because all entities qualifying as

an employer are responsible for complying with the FLSA and subject to its remedies.  See Falk,

414 U.S. at 195; Baystate Alternative Staffing, Inc. v. Herman, 163 F.3d 668, 675 (1st Cir.

1998).

## A.    HILL COUNTRY FARMS

To support its argument that West Liberty foods was the workers' employer, defendants

rely heavily on the similarity of the relationship between the boners and the slaughterhouse in

Rutherford Food, and the workers with disabilities and West Liberty Foods in the current case.

331 U.S. at 729.  In Rutherford Food, the defendant, a slaughterhouse operator, entered into a

written contract with an experienced beef boner to assemble a group of skilled boners to bone all

of the slaughterhouse's beef.  Id. at 724.  The Supreme Court affirmed the reasoning and

conclusion of the Circuit Court of Appeals, which said:

> "The operations at the slaughterhouse constitute an integrated economic unit
> devoted primarily to the production of boneless beef.  Practically all of the work
> entering into the unit is done at one place and under one roof. * * * The boners
> work alongside admitted employees of the plant operator at their tasks.  The task
> of each is performed in its natural order as a contribution to the accomplishment
> of a common objective."  In its view the test for determining who was an
> employee under the Act was not the common law test of control, "as the Act
> concerns itself with the correction of economic evils through remedies which
> were unknown at common law * * *."  It concluded that the "underlying
> economic realities * * * lead to the conclusion that the boners were and are
> employees of Kaiser * * *.

Id. at 726-27 (citing Walling v. Rutherford Food Corp., 156 F.2d 513, 516, 517 (10th Cir.

1946)).

In <u>Rutherford Food</u>, the middleman between the workers and the processing plant was an experienced worker, not a separate corporation.  331 U.S. at 724.  Here, Henry's Turkey Service negotiated with West Liberty Foods to provide its workers—referred to as its employees in the contract—in exchange for compensation per turkey processed.  The contractual term "employee" is not binding on Henry's Turkey Service, but it is evidence of the relationship between it and the workers with disabilities.  Additionally, in respect to the turkey plant workers, Hill Country Farms negotiated the compensation rates with West Liberty Foods, and took payments from it in exchange for the workers' labor.  Defendants also cite <u>Heath v. Perdue Farms, Inc.</u>, 87 F. Supp. 2d 452, 461 (D. Md. 2000), a case with similar facts as <u>Rutherford Food</u>, but also having an experienced worker act as middleman between the plant and the other workers.  Whatever control West Liberty Foods had or did not have over the workers with disabilities, the economic reality is that Henry's Turkey Service asserted control as their employer.

Defendants offer no separate argument in respect to the bunkhouse workers, in effect conceding that they were Henry's Turkey Service employees.  In respect to both turkey plant and bunkhouse workers, Hill Country Farms listed the workers as employees with the Texas Workforce Commission's Unemployment Tax Services, paid their Medicare and Social Security taxes, and submitted W-2 tax forms on their behalf.  Moreover, defendant Henry, in his deposition, stated that Hill Country Farms was their employer.  Thus, Hill Country Farms d/b/a Henry's Turkey Service was the employer of the turkey plant and bunkhouse workers and responsible to comply with FLSA requirements.

**B.    HENRY**

The Eighth Circuit has held that the Family and Medical Leave Act definition of "employer," 29 U.S.C. § 2611(4)(A)(ii)(I), which is almost identical to the FLSA definition, can

13

expose an individual to liability for overtime and minimum wages.  Darby v. Bratch, 287 F.3d 673, 681 (8th Cir. 2002); see also Wirtz v. Pure Ice Co., 322 F.2d 259, 262-63 (8th Cir. 1963) (implicitly assuming FLSA individual liability); Chambers Const. Co. v. Mitchell, 233 F.2d 717, 724 (8th Cir. 1956) (affirming FLSA injunction against owner/manager in his individual capacity).  The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages.  Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983) (collecting cases).

"In Agnew, the court determined that 'corporate officers with a significant ownership interest who had operational control of significant aspects of the corporation's day to day functions, including compensation of employees, and who personally made decisions to continue operations despite financial adversity during the period of non-payment' were employers under the FLSA."  Elliott Travel, 942 F.2d at 965 (quoting Agnew, 712 F.2d at 1514).  In Pure Ice, the Eighth Circuit noted that a conclusion would be "well supported" that an individual is an employer under the FLSA by "a combination of stock ownership, management, direction and the right to hire and fire employees."  Pure Ice, 322 F.2d at 263.

In Elliott Travel, the defendant sued individually was "the chief corporate officer, had a significant ownership interest in the corporation, and had control over significant aspects of the corporation's day-to-day functions, including determining employee salaries."  942 F.2d at 966.  The court noted that other employees did the computational work associated with paying employees, but this did not preclude finding that the individual defendant was an employer.  Id.  Exclusive control of day-to-day functions is not necessary, the court said, "[t]he party need only

14

have 'operational control of *significant aspects* of the corporation's day to day functions.' " Id. (quoting Agnew, 712 F.3d at 1514).

In Pure Ice, the court concluded that the defendant owner of the defendant ice manufacturing facility was not an FLSA employer because, although he was the controlling stockholder, he did not "supervise[] the relationship between the corporation and its employees . . . . That he might have acted '* * * in the interest of an employer (the corporation) in relation to an employee' is beside the point as long as he did not do so."  322 F.2d at 263 (quoting 29 U.S.C. § 203(d)).  The owner lived in a different city, had other business interests including other ice companies, delegated FLSA compliance to managers of his various companies, visited the Pure Ice plant two or three times a year, and was not involved at all with hiring employees or fixing their wages or hours.  Id.  In other words, a finding that a corporate officer or owner has *the power* to exercise operational control over the functions of the corporation is not sufficient to conclude that he or she is an FLSA employer, he or she must have *exercised* that power.  See id.  Like the individual defendant in Pure Ice, id., Henry did not live in the same city as the plant, visiting a few times per year.

In Chambers Construction, 233 F.2d at 724, on the other hand, the owner of the company was found to qualify as an employer under 29 U.S.C. § 203(d).  The difference was that the owner "engaged in the active management of the affairs of the corporation."

> [T]he supervisors and home office force were hired by him directly and the wages paid all employees were subject, in varying degrees, to his control. The lower court based its individual injunction on the finding that Mr. Chambers is not merely the president and manager of Chambers Construction Company, "it is his creature, an instrumentality by which he does business and operates in the contracting field. In reality it is Mr. Chambers incorporated and, in practical effect, is subject to termination at his pleasure or option."

Chambers Construction, 233 F.2d at 724.

15

Henry was a significant owner of the company, holding 50% of its stock.  See id.  He also had the power to control, and controlled, significant aspects of the corporation's day-to-day functions, see Pure Ice, 322 F.2d at 263, having negotiated the compensation from West Liberty Foods and actively controlling the company's finances.  He also made decisions in respect to scheduling at the bunkhouse, and after deciding to quit providing workers to West Liberty Foods he determined the order in which the plant workers would stop working there.  See Elliott Travel, 942 F.2d at 965.  Considering his stock ownership, his control over company finances, and his exercise of control over the operation's day-to-day functions, and despite living in Texas and delegating some aspects of the day-to-day functions of the company to other employees, Henry was an employer of the turkey plant and bunkhouse workers under the FLSA.  See id., Chambers Construction, 233 F.2d at 724, and Pure Ice, 322 F.2d at 262-63.

## II.    AMOUNT OF BACK WAGES

### A.    WILLFULNESS OF VIOLATIONS

In normal circumstances, violations of the FLSA minimum wage and overtime requirements are subject to a two-year statute of limitations. 29 U.S.C. § 255(a).  If violations are willful, however, the limitations period is three years.  Id.  Thus, if the Secretary proves " 'that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute,' " the statute of limitations is extended from two years to three.  Elliott Travel, 942 F.2d at 967 (quoting McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)).

In Elliott Travel, id., the Sixth Circuit affirmed the district court's grant of summary judgment as to the employer's willfulness because the employer had actual knowledge of the FLSA overtime provisions prior to the violations.  The Department of Labor's Wage and Hour

16

Division had investigated the employer on two prior occasions and found the employer in violation of the same provisions as were at issue in the case.  Id.  The employer paid back wages on one occasion, but refused on the second.  Id.  The employer did not change its practices and refused to pay back wages after the Secretary brought the suit.  Id.

The circumstances in Elliott Travel are very similar to those at issue here.  Id.  On two prior occasions, the Wage and Hour Division investigated Hill Country Farms, found that the company had violated FLSA overtime wage requirements, and the company agreed to pay back wages and comply with that and other FLSA requirements in the future.  After the second investigation, the Wage and Hour Division explained in detail the FLSA's requirements including, but not limited to, minimum wages, overtime compensation, 3(m) credits and record keeping, and provided Hill Country Farms with materials detailing how to comply.  Hill Country Farms, however, did not make any changes to its wage formula.  Every month, the company reimbursed itself for room and board from the employees' checking accounts funded by SS and SSI benefits.  It also deducted room and board expenses from employees' wages, always reducing each employee's pay to the exact amount that would not decrease his SS or SSI benefits.

Henry negotiated the pay rates with West Liberty Foods and controlled the corporation's financial decision making.  He, like the corporation, was aware of the two Wage and Hour investigations, its findings, its instructions for the future, and Hill Country Farms' agreement to comply with minimum wage, overtime compensation, 3(m) credits, and record keeping requirements.  Thus, both defendants willfully violated minimum wage and overtime laws, and accordingly, the statutory limitations period is three years.  Elliott Travel, 942 F.2d at 967.  See

also Heath, 87 F. Supp. 2d at 461 (summary judgment record showed that defendant's violation of the FLSA was willful).

**B.     LIQUIDATED DAMAGES**

Employers that violate the FLSA are normally liable for both unpaid wages and an equal amount in liquidated damages.  29 U.S.C. § 216(b).  The employer can avoid liquidated damages, however, by showing that it acted in good faith and had reasonable grounds for believing that the act or omission giving rise to the violation was not contrary to the FLSA.  29 U.S.C. § 260.  "The employer bears the burden of proving both good faith and reasonableness, 'but the burden is a difficult one, with double damages being the norm and single damages the exception.' "  Chao v. Barbeque Ventures, LLC , 547 F.3d 938, 941-42 (8th Cir. 2008) (quoting Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999)).  For the same reasons discussed in the previous section establishing willfulness, defendants cannot meet their burden to show that they acted in good faith and had reasonable grounds for believing that their acts or omissions did not violate the statute.  See Barbeque Ventures, 547 F.3d at 942.  Liquidated damages will be assessed.

**C.     ACCOUNTING FOR BACK WAGES**

Defendants dispute the amounts of back wages calculated by the Secretary arguing that the investigator's accounting is improper.  Defendants state in their brief:

> The Auditor used the wrong data in constructing the earnings. The West Liberty Foods piece rate payments to an hourly rate and then attribute the portion of the weekly payment among each individual to determine if their portion exceeded the minimum wage ratio.

> The foundation for the computation of minimum wages or overtime pay is the gross earnings of the group divided among the workers.

18

(Defs.' Brief at 10.)  It is unclear whether defendants are describing the method the investigator

used, or the method that should be used.  It is also not clear how dividing the payments from

West Liberty Foods into an hourly rate and then attributing that rate to the individual workers is

different from dividing the gross weekly payments among the workers, because that amount was

divided by the hours worked.

Defendants make a similar denial in their response to the Secretary's statement of

undisputed material facts, but again, provide no explanation as to why the accounting is

improper.  According to LR 56.b,

> A response to an individual statement of material fact that is not expressly
> admitted must be supported by references to those specific pages, paragraphs, or
> parts of the pleadings, depositions, answers to interrogatories, admissions,
> exhibits, and affidavits that support the resisting party's refusal to admit the
> statement, with citations to the appendix containing that part of the record. The
> failure to respond, with appropriate citations to the appendix, to an individual
> statement of material fact constitutes an admission of that fact.

LR 56.b.  On January 13, 2011, I noted that defendants failed to support, with citations to the

appendix, their denials of the Secretary's statements of undisputed material facts, including the

facts concerning the investigator's accounting .  I ordered defendants to amend their response to

the Secretary's statement of undisputed material facts so that it complied with LR 56.b.  I also

noted that failure to do so would constitute an admission of all facts in the Secretary's statement

of material facts.  Defendants filed an amended response, but again failed to cite references in

the appendix supporting their denial that the Secretary's accounting was proper.  Defendants, by

failing to respond with appropriate citations to the appendix, have thereby admitted that the

Secretary's accounting is correct.  LR 56.b.  See also Elliott Travel, 942 F.2d at 968 (affirming

district court's grant of summary judgment as to Secretary's accounting for wages because

19

defendant failed to identify a genuine dispute of fact).  Moreover, defendants offer no coherent

argument setting forth any reason that the accounting is flawed.

As to the amounts that Hill Country Farms applied as in-kind wages to the workers' pay,

section 3(m) of the FLSA includes as wages, "the reasonable cost . . . to the employer of

furnishing [the] employee with board, lodging, or other facilities, if such board, lodging, or other

facilities are customarily furnished by such employer to his employees . . . ."  29 U.S.C.

§ 203(m).  "[T]he employer lawfully may deduct from an employee's pay the reasonable cost of

employer provided housing, even if that deduction results in the employee's cash pay falling

below the statutory minimum.  Reasonable cost may not exceed the employer's actual cost."

Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1513 (11th Cir. 1993) (citing 29 C.F.R. §

531.3(a)).  The burden of proving the value of the lodging provided is on the employer.  See

Donovan v. Williams Chem. Co., Inc., 682 F.2d 185, 190 (8th Cir. 1982).  Employers are

required by regulations to keep records of the cost of such facilities, 29 C.F.R. § 516.27, and the

burden does not shift to the Secretary if the employer fails to do so.  Williams Chem., 682 F.2d

at 190.

Defendants have not cited any records documenting its costs for providing lodging.  In

their appendix, Henry's affidavit states that the Texas Attorney General seized Hill Country

Farms' records and will not release them for trial.  This affidavit was not cited in defendants'

resistance materials to challenge any of the Secretary's statements of undisputed facts, and

defendants did not submit their own statement of facts.  Even if defendants had provided

documents, the undisputed facts are that Hill Country Farms applied workers' SS and SSI

benefits payments to their room and board and in-kind care.  Defendants have not met their

burden of showing any amount of reasonable cost to Hill Country Farms in excess of SS and SSI

20

benefits amounts attributable to the workers' room and board.  Accordingly, no credit toward the workers' wages is available.

In conclusion, under the FLSA both defendants were the turkey plant and bunkhouse workers' employers during the relevant time period.  <u>See</u> <u>Rutherford Food</u>, 331 U.S. at 729, and <u>Elliott Travel</u>, 942 F.2d at 967.  Both are jointly and severally liable for the workers' unpaid wages.  <u>See</u> <u>Baystate Alternative Staffing</u>, 163 F.3d at 675.  The three-year statute of limitations applies.  <u>See</u> <u>Elliott Travel</u>, 942 F.2d at 967.  The amount of back wages owed by defendants to the workers is that set forth in the Secretary's accounting, $880,777.17.  Defendants are also liable for an equal amount of liquidated damages, <u>see</u> <u>Barbeque Ventures</u>, 547 F.3d at 942, pushing the total damages to $1,761,554.34.

**RULING**

For the reasons articulated above, the motion for partial summary judgment filed by plaintiff Hilda Solis, Secretary of Labor, United States Department of Labor, is **GRANTED**.  A bench trial is scheduled for May 16, 2011, to decide the remaining issues.

**DATED** this 21st day of April, 2011.

HAROLD D. VIETOR
Senior United States District Judge